IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| RETZLAFF GRAIN COMPANY, INC., | |
| Plaintiff, | **8:20CV289** |
| vs. | |
| JORDAN EGGLI, CHAD NEEDHAM, CRYSTAL KONECKY, ROBB KIGER, and NORAG LLC, | **MEMORANDUM AND ORDER** |
| Defendants. | |

This matter is before the Court on Defendants Jordan Eggli ("Eggli"), Chad Needham ("Needham"), Crystal Konecky ("Konecky"), Robb Kiger ("Kiger" and collectively, "Individual Defendants"), and NORAG LLC's ("NORAG" and collectively, "Defendants") Motion for Summary Judgment. (Filing No. 181.) For the reasons explained below, the motion will be granted, in part.

**FACTUAL BACKGROUND**

Plaintiff Retzlaff Grain Company, Inc. ("Plaintiff") is a transportation broker for agricultural products. The Individual Defendants were previously employed by Plaintiff and are now employed by Defendant NORAG. NORAG is Plaintiff's competitor.

While employed by Plaintiff, the Individual Defendants each signed a Confidentiality and Non-Solicitation Agreement ("Agreement"). The Agreement, which was signed by both a representative from Plaintiff and the applicable Individual Defendant, included a non-solicitation provision that provided that for a period of twelve months after the conclusion of employment, the

employee could not: (1) cause or attempt to cause any employee to leave Plaintiff's employ; (2) actively recruit any employee to work for another business with which the Individual Defendants become affiliated; or (3) solicit or attempt to solicit the business of up to ten customers identified by Plaintiff in writing at the time employment ended (or shortly following). Pursuant to the Agreement, those customers would be entities who the employee did business with and/or contacted during the last twelve months of employment and/or entities whose accounts the employee was involved with during the last twelve months of employment. (Filing No. 89-1; Filing No. 89-2; Filing No. 89-3; Filing No. 89-4.)

The Agreement had a separate confidentiality provision that provided the employee would not disclose any confidential information. "Confidential Information" was defined as "non-public information of value, including trade secrets and proprietary information, whether in written, electronic or other form or within your memory, relating to [Plaintiff's] business, property, products, services, operations, sales, prospects, research, customers, business relationships, business plans and finances." (Filing No. 89-1; Filing No. 89-2; Filing No. 89-3; Filing No. 89-4.) The Agreement also contained a severability provision, which provided that if any portion of the Agreement proved to be "invalid or unenforceable," the remainder of the Agreement would not be affected. (Filing No. 89-1; Filing No. 89-2; Filing No. 89-3; Filing No. 89-4.) The Employee Handbook likewise contained a provision that prohibited disclosure of confidential information belonging to Plaintiff. (Filing No. 189-1.)

Konecky worked for Plaintiff as Needham's brokerage assistant. (Filing No. 184-7.) During her employment, Konecky created Google Docs spreadsheets that she shared with Plaintiff's employees on a Google Drive. (Filing No. 184-6.) Konecky started creating spreadsheets and using the Google Drive when she worked for another employer—before she started working for Plaintiff (Filing No. 184-6.) Konecky explained in her deposition that the Google Drive is where Google Docs are stored. (Filing No. 184-6.) The Google Docs included carrier contacts, carrier lane information, load lists, and carrier activity. (Filing No. 189-3; Filing No. 184-6; Filing No. 184-7; Filing No. 190-15; Filing No. 190-16.) The documents were accessed via individual gmail accounts. (Filing No. 189-3.) Konecky resigned her position on June 14, 2018, and her last day of employment with Plaintiff was July 6, 2018. (Filing No. 189-3; Filing No. 205.) One of the reasons she resigned was because she believed Needham was about to be

terminated. (Filing No. 184-6.) On June 25, 2018, after she gave her resignation, but while still employed by Plaintiff, Konecky emailed Needham links to 25 Google documents. (Filing No. 189-3.) After she left Plaintiff, Konecky went to work for CSC, another freight broker. (Filing No. 184-6.) Plaintiff did not provide Konecky a list of ten customers ("Ten-Client List") whom she was not to solicit per the terms of the Agreement. (Filing No. 189-3.)

Needham was employed by Plaintiff as a freight broker and sales director. (Filing No. 189-1; Filing No. 205.) Needham also served as the manager of the freight broker group in Omaha. (Filing No. 189-1; Filing No. 205.) He was the direct manager of Konecky, Kiger, and Michael Burrus ("Burrus"). (Filing No. 189-1; Filing No. 205.) As manager, Needham had full access to Plaintiff's confidential and proprietary information, including customer and carrier lists; customer and carrier contact lists; customer and carrier rate and volume data; customer daily, monthly and annual freight service needs; profit margins for customers and specific lanes; and accounts payable and accounts receivable.[1] (Filing No. 189-1; Filing No. 205.) Needham also had full access to all Plaintiff's customer and carrier information, including all data and information contained within Plaintiff's Strategy software system. (Filing No. 189-1; Filing No. 205.)

Needham was reported for workplace harassment in April 2018. (Filing No. 189-1; Filing No. 205.) Needham contacted Bryce Wells—Plaintiff's owner, founder, and president—and requested a meeting after Needham had been interviewed by a law firm hired to investigate the harassment report. (Filing No. 189-1; Filing No. 205; Filing No. 189-1.) Wells met with Needham and told him that Plaintiff could not comment or provide him any assurances until the investigation was complete. (Filing No. 189-1; Filing No. 205.) Following this meeting, Needham applied for another job. (Filing No. 189-1; Filing No. 205.)

Plaintiff terminated Needham on July 12, 2018. (Filing No. 189-1.) The day before he was terminated, Needham emailed himself a copy of a draft agreement between Mars Global and Plaintiff, with attached negotiated terms. (Filing No. 189-3; Filing No. 189-7.) Upon his

---

[1]As described by Defendants, and as used in this Memorandum and Order, "Shippers" are companies that need products transported from one location to another. "Carriers" are trucking companies that provide transportation and delivery of a shipper's product. "Loads" are the number of trips made for carriers and shippers. Loads that travel from one specific origin to one specific destination on a frequent basis are grouped together and described as "Lanes." (Filing No. 214, at CM/ECF p. 3.)

termination, Needham was given a Ten-Client list, naming the following entities as customers he could not solicit pursuant to the terms of his Agreement: Land O' Lakes; Cargill-Rendering; Cargill-Food and Nutrition; Mars Pet Raw; Envirotech Services, Inc.; Hereford Feed Ingredients; Nestle Purina Petcare; Darling Ingredients; Tyson Foods, Inc.; and Ardent Mills. (Filing No. 184-7; Filing No. 189-1; Filing No. 189-6.) Drew Waggoner, Plaintiff's current Director of Marketing and Brokering, testified that Tyson Foods, Inc. was included on Needham's Ten-Client list because it was a large customer and Needham had internal knowledge of Tyson. (Filing No. 184-2; Filing No. 189-3.)

When he was terminated, Needham was asked to leave the premises and return at 5:15 p.m.. (Filing No. 184-7.) Before he left, Wells asked Needham to return his cell phone. (Filing No. 184-7.) Needham did not immediately return the phone because he thought the phone was his. (Filing No. 184-7.) After Needham left, Wells went to Plaintiff's controller to verify that the phone belonged to the company. (Filing No. 184-1.) Later that day, Needham was informed that because the phone had been "upgraded," the phone belonged to Plaintiff. (Filing No. 184-7.) Needham testified that he was told to return the phone to Plaintiff when he returned at 5:15 p.m. (Filing No. 184-7.) Needham agreed to return the phone, but before he did so, he went to Verizon and had it factory reset—erasing all data that had been on the phone. (Filing No. 184-7.) Needham testified that he had some information, including some pictures and contacts, transferred from his old phone to his new phone before he returned it. (Filing No. 184-7.) Needham had someone at Verizon assist him with the transfer process. (Filing No. 184-7.) Other than the phone, Needham took a couple notebooks with him when he left, which he returned. (Filing No. 184-7.)

On July 18, 2018, Needham received a call from Samantha Rhone, who worked for a company called M7 Logistics. (Filing No. 184-7.) She told Needham that NORAG had purchased M7. (Filing No. 184-7.) She told him that M7 was coming to sign the papers and that Needham should call Matt Rowan, who was a NORAG employee. (Filing No. 184-7.) Once Needham got off the phone with Rhone, Rowan called him and asked Needham to meet with him that afternoon. (Filing No. 184-7.) Needham was offered a job with NORAG during the meeting with Rowan and started working at NORAG on July 23, 2018. (Filing No. 184-7.) NORAG acquired M7 effective July 25, 2018. (Filing No. 191-3; Filing No. 191-4; Filing No. 205.)

Plaintiff had been in discussions with M7 during the spring and summer of 2018 to purchase M7's book of business. (Filing No. 205.) Wells met with M7 as late as July 11, 2018 to discuss the potential merger. (Filing No. 189-1; Filing No. 205.) Wells believed that the parties were heading towards the conclusion of a merger. (Filing No. 189-1; Filing No. 205.) Needham was aware of the discussions between Plaintiff and M7 before his termination but testified that he was told the deal was not going to happen. (Filing No. 184-7.) Needham testified he was unaware that NORAG was in negotiations with M7 when he was terminated and that he was not part of NORAG's discussions with M7 about the acquisition. (Filing No. 184-7.)

Needham began soliciting customers identified on his Ten-Client List upon joining NORAG. (Filing No. 184-7.) Those customers included Land-O-Lakes, Cargill, Ardent Mills, and Envirotech. (Filing No. 184-7; Filing No. 205.) When Needham started working at NORAG, Rowan set up a conference call with Land-O-Lakes, Cargill, and Envirotech, and told them Needham had joined NORAG. (Filing No. 184-7.) Needham was on the conference call. (TR. 184-7.)

Needham testified that NORAG did not place any restrictions on him which limited him from conducting business with any customer. (Filing No. 184-7.) Needham testified NORAG decided not to do business with any customer with whom it did not have an established relationship, except for spot market and add-on type business—which means business in lanes that were not dedicated or owned by Plaintiff. (Filing No. 184-7.) Needham testified that NORAG decided it would not do business with Mars, Nestle PetCare, and Tyson Foods until Needham's one-year non-compete was up. (Filing No. 184-7.) Needham stated that NORAG's business with Land-O-Lakes and Cargill has increased since he has been at NORAG. (Filing No. 184-7.) Following Needham's termination, Plaintiff experienced a decline in revenues from Land-O-Lakes, Darling Ingredients, Ardent Mills, Hereford Ingredients and Envirotech. (Filing No. 189-1; Filing No. 189-2; Filing No. 205.)

In email communications with customers, Needham quoted Plaintiff's historical rates when negotiating rates for NORAG. (Filing No. 190-9; Filing No. 190-10; Filing No. 190-11; Filing No. 205.) Needham testified during his deposition that lane data information, which includes customer rates, carrier rates, volumes and locations, is valuable in the freight brokerage business. (Filing No. 184-7.) Needham stated that NORAG considers lane data information confidential,

and that Plaintiff considered lane data to be "no more confidential" than NORAG.  (Filing No. 184-7.)  Needham also stated that NORAG deems its customer contact lists, customer and carrier contact lists, load lane histories, financial data, and sales revenue information to be confidential. (Filing No. 184-7.) Needham acknowledged that the volume a customer ships in a particular lane is partially publicly known because it is based on markets for the rates, but that lane information is not available on public boards.  (Filing No. 184-7.)

Konecky was offered a position with NORAG in November 2018, and began working for NORAG in late December 2018 or early January 2019.  (Filing No. 184-6.) Konecky continued to use the Google Docs after she left Plaintiff and while employed with NORAG.  (Filing No. 184-6.)  Though she could not recall why she did so, Konecky restricted Plaintiff's employees' access rights to the Google Docs. (Filing No. 184-6.) Konecky shared the Google Drive with people at NORAG after she left Plaintiff's employment.  (Filing No. 184-6.)

Kiger was employed by Plaintiff as a freight broker.  (Filing No. 189-3.)  Kiger testified that he used the Google Drive that had Google documents[2] on it while he worked for Plaintiff, and that the Google documents included carrier lists and loads lists.  (Filing No. 184-9.)  Kiger spoke to Needham in March or April 2019 about the prospect of coming to work for NORAG.  (Filing No. 184-9.)  Needham told him to come back in August. (Filing No. 184-9.)  Kiger testified in his deposition that he followed-up with Needham in August 2019 because he was looking to leave Plaintiff.  (Filing No. 184-9.) Kiger resigned his position with Plaintiff on August 29, 2019. (Filing No. 189-3.) At that time, Kiger was asked to return his cell phone.  (Filing No. 184-9.)  Kiger refused to turn the phone over because he thought it belonged to him.  (Filing No. 184-9.)  Kiger left Plaintiff's premises with the phone with Waggoner behind him.  (Filing No. 184-9.)  Kiger immediately went to Verizon to have the phone cleared out before he returned it.  (Filing No. 184-9.)  Kiger stated that Waggoner was present when the factory reset occurred.  (Filing No. 184-9.) Kiger then returned the phone and replaced it with a new one a couple days later.  (Filing No. 184-9.)  Kiger stated that the contacts on his old phone could not be transferred to his new phone. (Filing No. 184-9.)

---

[2] Kiger recognized them as Google *Sheets*" rather than Docs.  (Filing No. 184-9.)

Following his resignation, Plaintiff provided Kiger a Ten-Client List including the following entities: Church and Dwight; Advanced Marketing Group; Wilbur Ellis Company; Pilgrim's Pride; Summit Procurement; Sunfair Marketing; Bowman Andros Productions; ACJ International; and US Silica Company. (Filing No. 184-9.) Kiger testified he did not alert anyone at NORAG that he had a non-compete agreement with Plaintiff, and that NORAG did not put any restrictions on him regarding contacting customers. (Filing No. 184-9.) Kiger did business with Advanced Marketing Group and Church & Dwight while employed at NORAG during the year following his separation from Plaintiff. (Filing No. 184-9.) Plaintiff experienced a decline in revenue from Advanced Marketing Group, Church & Dwight, Bowman Andros and Sunfair Marketing following Kiger's departure. (Filing No. 189-1; Filing No. 205.) Kiger testified he did not use Plaintiff's Google Docs at NORAG. (Filing No. 184-9.)

Kiger spoke to Burrus about potential employment at NORAG a month or two after Kiger left Plaintiff. (Filing No. 184-9.) Needham testified he also told Burrus he could join NORAG whenever he wanted, and that this conversation occurred within the first year of Needham's departure from Plaintiff. (Filing No. 184-7.) Burrus never joined NORAG. (Filing No. 184-7.) Plaintiff gave Burrus a raise to convince him to stay. (Filing No. 189-3.)

Eggli was employed by Plaintiff in a logistics support role. (Filing No. 189-3; Filing No. 205.) Eggli was tasked with lining up carriers to haul freight loads brokered by Plaintiff's brokers. (Filing No. 189-3; Filing No. 205.) Eggli did not have direct dealings with shipper customers. (Filing No. 189-3; Filing No. 205.) Eggli had access to customer and lane information while employed with Plaintiff, which was available in Plaintiff's Strategy software system. (Filing No. 184-8.) Eggli contacted Kiger about the possibility of working at NORAG in October 2019. (Filing No. 184-8.) Kiger gave Eggli Needham's phone number, and Eggli contacted Needham in October 2019. (Filing No. 184-8.) Eggli testified he had lunch with Needham in February of 2020 about employment with NORAG. (Filing No. 184-8.)

Eggli resigned his position with Plaintiff on February 21, 2020 and went to work at NORAG. (Filing No. 189-3; Filing No. 205.) At 7:16 a.m. on the morning he resigned, Eggli emailed himself 29 pages of contact information for Plaintiff's customers and carriers. (Filing No. 189-3.) The email was from "Jordan Eggli [egglij1@gmail.com]" to Jordan Eggli [egglij@gmail.com]." (Filing No. 189-3.) Eggli testified that he emailed three or four load lists to

himself in the last month before he left Plaintiff so he could have them on hand to use when he went to work at NORAG.  (Filing No. 184-8.) Eggli stated he probably later uploaded the lists to a NORAG computer.  (Filing No. 184-8.) Eggli returned his company-issued phone on the day he resigned.  (Filing No. 184-8.) Following his resignation, Eggli was given a Ten-Client List.  (Filing No. 189-3; Filing No. 190-18.)  The List included, but was not limited to, the following entities: Taylor Transport, Pool Dog Trucking, Lamb Weston, and Nestle Purina.  (Filing No. 190-18.) Waggoner testified that Lamb Weston and Nestle Purina were included on Eggli's Ten-Client list, at least in part, because they were Plaintiff's dedicated or large customers.  (Filing No. 184-2; Filing No. 189-3.)

Eggli testified that he did not do business with anyone identified on his Ten-Client List when he went to NORAG. (Filing No. 184-8.) Eggli testified he did not notify anyone at NORAG that he had a non-compete because he assumed NORAG knew, and that NORAG did not put him under any restrictions because of the non-compete.  (Filing No. 184-8.)  Eggli spoke to Mai Lee and a couple other of Plaintiff's employees about employment with NORAG during the first couple months he was at NORAG.  (Filing No. 184-8.)  These individuals did not come to work for NORAG. (Filing No. 184-8.)

Plaintiff filed this suit on July 20, 2020.  (Filing No. 1.) Plaintiff requested an injunction, which was denied by the Court.  (Filing No. 30.) Plaintiff filed a second amended complaint on November 25, 2020, asserting ten claims, including one under the Nebraska Junkin Act, Neb. Rev. Stat. §§ 59-801, *et seq.*  (Filing No. 89.) The Court dismissed Plaintiff's Junkin claim on February 16, 2021.  (Filing No. 104.) The nine claims remaining at this time are for alleged (1) violations of the Defend Trade Secrets Act, against all Defendants; (2) violations of the Computer Fraud and Abuse Act, against all Defendants; (3) violations of the Nebraska Trade Secrets Act, against all Defendants; (4) Tortious Interference with Business Relations, against all Defendants; (5) Breach of Contract, against the Individual Defendants; (6) Breach of Duty of Loyalty, against the Individual Defendants; (7) Unjust Enrichment, against all Defendants; (8) Civil Conspiracy, against all Defendants; and (9) Aiding and Abetting, against Needham and NORAG.  (Filing No. 89.)

Plaintiff alleges Defendants misappropriated the following categories of proprietary and trade secret information:  truck companies' availability; lane data (including customer rates, rates

to the carrier, volumes, and locations); customer payment history evidencing history of expenditures, favorable pricing objectives based on supply and demand; load compilation lists;[3] carrier compilation lists; customer lists; customers' specific patterns of geographical needs, including load and lane history; employee compensation and benefits information; and financial data including gross revenue and margins. (Filing No. 89.)

Plaintiff retained Janet Labenz ("Labenz") to testify as an expert witness in this case. Labenz's expert report states that she was engaged to determine the financial loss Plaintiff suffered due to lost business revenues suffered due to business Plaintiff asserts was wrongfully misappropriated by Defendants. (Filing No. 220-3.) Labenz confirmed that she was "generally familiar" with claims arising from misappropriation of trade secrets and violations of non-compete agreements but testified that her report did not quantify [damages] as to trade secrets or non-compete." (Filing No. 184-10.) Labenz's report was to analyze (1) lost profit damages sustained due to loss of freight business from specific carriers formerly managed by Needham; (2) lost profit damages sustained due to loss of freight business from specific shippers formerly managed by Needham; (3) lost profit damages sustained due to loss of freight business from specific shippers formerly managed by Kiger; and (4) lost profit damages sustained due to loss of freight business from carriers formerly managed by Eggli. The report assumes that Plaintiff suffered a decline in business volume and revenue due to the actions of the Individual Defendants. (Filing No. 220-3.) Labenz does not have an opinion regarding the proximate cause of any of the losses claimed by Plaintiff. (Filing No. 184-13.) Labenz testified that her analysis did not cover any financial loss due specifically to Konecky's actions or NORAG—except in its connection as the Individual Defendants' employer. (Filing No. 184-10.) Labenz's analysis focused on the actions of Needham, Kiger, and Eggli. (Filing No. 184-10.)

To perform her analysis, Labenz reviewed the "Master Load Data File" created by Plaintiff which purports to show revenue, gross profit, sales representatives, and dates for all loads by shippers, carriers, and lanes. Labenz then reviewed the quarterly revenue, profit and number of loads and lanes for the designated loads and designated lanes managed by Needham, Kiger, and Eggli. After she reviewed these materials, Labenz determined the point at which business volume

---

[3] "Lane data" information generally includes customer rates, carrier rates, volumes, and locations. (Filing No. 184-7.)

and revenue, and associated profits began to decline for the designated loads and designated lanes, and compared the profit decline date with Needham, Kiger and Eggli's departure dates. The report states Labenz considered external factors that could have impacted Plaintiff's revenue and profitability but found no indication Plaintiff suffered lost profits due to general economic downturns, the COVID pandemic, industry pricing or other general facts. (Filing No. 220-3.) Labenz concluded that Plaintiff experienced a financial loss due to the decline in revenue and profits commensurate with the timing of Needham, Kiger and Eggli's cessation of employment. (Filing No. 220-3.)

## STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party. *Id.* "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* "The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could reasonably find for the nonmovant." *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011) (quotation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Torgerson*, 643 F.3d at 1042 (quotation omitted).

**DISCUSSION**

### 1. Breach of Contract

Plaintiff contends the Individual Defendants breached the terms of their respective Confidentiality and Non-Solicitation Agreements ("Agreement"). Plaintiff alleges Needham and Eggli breached their Agreements by soliciting business from customers identified on their Ten-Client lists, soliciting Plaintiff's employees, and misappropriating Plaintiff's confidential information. Plaintiff alleges Konecky breached her Agreement by misappropriating confidential information, and that Kiger violated his Agreement by soliciting the business of one or more of the customers identified on his Ten-Client List and misappropriating Plaintiff's confidential information.

To recover for breach of contract, Plaintiff must plead and prove the existence of a promise, a breach of that promise, damages, and satisfaction of any conditions precedent to the defendant's duty to perform. *See Henriksen v. Gleason*, 263 Neb. 840, 847, 643 N.W.2d 652, 658 (2002). Defendants make several arguments why Plaintiff's breach of contract claims fail. These arguments will be addressed separately below.

### A.    Validity of the Agreements

Needham and Eggli first argue that their respective Agreements are unenforceable because the non-solicitation provision contained in each of their Agreements is overbroad, rendering their Agreements invalid in their entirety.

Under Nebraska law, non-compete and non-solicitation clauses are not automatically enforced. *See Gaver v. Schneider's O.K. Tire Co.*, 289 Neb. 491, 500-01, 856 N.W.2d 121, 129 (2014). To determine whether a covenant not to compete is valid, a court must assess "whether a restriction is reasonable in this sense that it is not injurious to the public, that it is not greater than is reasonably necessary to protect the employer in some legitimate interest, and that it is not unduly harsh and oppressive on the employee." *Pro. Bus. Servs., Co. v. Rosno*, 256 Neb. 217, 223, 589 N.W.2d 826, 831 (1999). To be valid, a provision providing for non-solicitation of customers must only restrict "a former employee from working for or soliciting the former employer's clients or accounts with whom the former employee actually did business and had personal contact." *Id.*

*See also Polly v. Ray D. Hilderman & Co.,* 225 Neb. 662, 668, 407 N.W.2d 751, 756 (1987) (stating that a covenant not to compete "may be valid only if it restricts the former employee from working for or soliciting the former employer's clients or accounts with whom the former employee actually did business and has personal contact).

Importantly, Nebraska courts do not employ the "blue pencil rule" to amend or strike non-enforceable provisions in restrictive covenants, such as non-compete and non-solicitation provisions. *CAE Vanguard v. Newman,* 246 Neb. 334, 339, 518 N.W.2d 652, 655 (2008). Separate paragraphs of a covenant not to compete cannot be severed, so if any portion is unenforceable, the remainder is also unenforceable. *H & R Block Tax Serv., Inc. v. Circle A. Enterprises, Inc.,* 269 Neb. 411, 693 N.W.2d 548 (2005). A non-solicitation provision must be enforced as written, or not enforced at all. *CAE Vanguard,* 246 Neb. at 339, 518 N.W.2d at 655. *See also Unlimited Opportunity, Inc. v. Waadah,* 290 Neb. 629, 861 N.W.2d 437, 441 (2015) ("[I]t is not the function of the courts to reform a covenant not to compete in order to make it enforceable).

Needham and Eggli argue the non-solicitation provision is overbroad (thus unenforceable) because it precludes them from soliciting customers with whom they did not personally do business or have contact. The non-solicitation provision contained in each of their Agreements provides:

> 1.   <u>Covenants Not to Interfere or Solicit</u>. During the term of your employment and for a period of twelve (12) months after your employment ends for any reason, you will not do any of the following:
>
> a.   Cause or attempt to cause any employee of [Plaintiff] to leave the employ of [Plaintiff];
>
> b.   Actively recruit any employee of [Plaintiff] to work for any business or organization, with which you become affiliated, whether as an employee, consultant, owner or otherwise; and
>
> c.   Solicit, divert or take away, or make attempts to solicit, divert or take away, the business or patronage of up to ten (10) clients or customers of [Plaintiff] (which can be shippers or carriers or a combination of the two) that are identified by [Plaintiff] in writing to you at the time your employment ends (or shortly following your separation from employment). These clients or customers will be i) entities or individuals who you did business with and/or contacted during the last 12 months of your

employment with [Plaintiff] and/or ii) entities or individuals whose accounts you had involvement with during the last 12 months of your employment with [Plaintiff].

(Filing No. 1-1; Filing No. 1-2). Needham argues the Ten-Client List he was given pursuant to Section 1(c) includes two clients (Nestle Purina Petcare and Tyson Foods, Inc.) with whom he did not do business. Eggli maintains his Ten-Client List includes two clients (Lamb Weston and Nestle Purina) with whom he did not business. Based on the inclusion of these entities, Needham and Eggli argue their Agreements are completely unenforceable based on an overly broad non-solicitation provision.

The Court disagrees with Needham and Eggli's argument that the non-solicitation provision is overly broad.[4] It is limited in scope to protect Plaintiff's legitimate business interests to prevent use of its confidential business information. By its terms, the portion of the non-solicitation provision that precludes certain customer contact (Section 1(c)) is narrowly tailored to only extend to customers with whom Needham and Eggli did business with and/or contacted during the last 12 months of their employment and/or whose accounts they were involved with during the last 12 months of their employment. As discussed above, Nebraska courts have found non-compete and non-solicitation provisions containing such restrictions enforceable.

Here, the issue is not whether the non-solicitation provision is overly broad. Rather, the question is whether Plaintiff complied with the requirement in Section 1(c) to provide a list of customers fitting specific characteristics, meaning, those with whom Needham and Eggli had a business relationship with as defined in the Agreements. Because Section 1(c) of the non-solicitation provision pertaining to customers is not overly broad, the non-solicitation provision is not automatically invalid—which would then render all sections of the non-solicitation provision unenforceable.[5] As long as there is a genuine issue of fact as to whether Needham and/or Eggli were involved in business with all entities included on their Ten-Client Lists within the twelve-

---

[4] There is no indication or argument that enforcement of the non-solicitation provision would be injurious to the public or that the restriction is unduly harsh or oppressive.

[5] Even if the non-solicitation provision contained in the Agreements was completely unenforceable, the entirety of the Agreements would not be invalid. Plaintiff could still potentially recover for beach of the confidentiality provision contained in the Agreements. See Signature Style, Inc. v. Roseland, No. 4:19-cv-3089, 2020 WL 58456, at *3 (D. Neb. Jan. 6, 2020).

months before they ceased working for Plaintiff, Plaintiff's breach of contract claims based on solicitation of customers may move forward.

As to Needham, there remains a genuine issue of fact as to whether he violated Section 1(c) of the non-solicitation provision because there is evidence in the record that he may have been involved with Nestle Purina Petcare and Tyson Foods, Inc. Plaintiff has pointed to evidence in the record indicating that Needham may have had contact with these customers—at the very least by virtue of his supervisory position as manager of the Omaha brokerage group.[6] The same is not true for Eggli, however. Plaintiff does not dispute that Eggli was not involved with Lamb Weston or Nestle Purina. Plaintiff has therefore admitted that the Ten-Client List it provided to Eggli did not comply with the terms of the Agreement pertaining to Section 1(c)—solicitation of customers. Therefore, to the extent Plaintiff's breach of contract action against Eggli is based on that allegation, it must be dismissed.[7]

### B.    Proximate Cause and Damages

The Individual Defendants next argue Plaintiff's breach of contract claims must be dismissed because Plaintiff cannot show that their alleged wrongful conduct was the proximate cause of any damages. In any damage action for breach of contract, the plaintiff must prove that the breach of contract was the proximate cause of the damages. "This requires a causal relationship between the damages asserted and the breach relied upon." *Union Ins. Co. v. Land & Sky, Inc.*, 253 Neb. 184, 188, 568 N.W.2d 908, 911 (1997) (citations omitted).

---

[6] Needham admitted that he sent one email to Tyson Foods in the year prior to his departure. (Filing No. 183.) Plaintiff cited additional emails in opposition to summary judgment to support its contention that Needham had contact with Tyson Foods and Nestle Purina in the year following his departure. (Filing No. 189-3.) According to Defendants, however, these emails were not produced during discovery. If this is true, it is doubtful that these items would be admissible at trial. *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless"). The Court did not consider these items in ruling on the present motion.

[7] As to Kiger, there is no argument that the non-solicitation provision in his Agreement is invalid based on the inclusion of improper customers. Kiger's request for summary judgment is based on an argument that Plaintiff cannot show proximate cause or damages. This issue will be addressed below.

Plaintiff's expert—Labenz—does not have an opinion as to proximate cause.  Still, in cases such as this, "[t]he causation element can be met by the jury using its common sense and drawing reasonable inferences about the natural consequences of a party's actions." *Crabar/GBF v. Wright, 8:16-cv-537, 2023 WL 6125519, at \*12 (D. Neb. Sept. 19, 2023)*).  Although Plaintiff does not have expert testimony pertaining to causation, there is evidence in the record upon which a reasonable inference of causation could be made.

Plaintiff sustained lost revenue from certain customers contained in the Ten-Client Lists, whereas NORAG had an increase in business from those customers. Labenz opined that Plaintiff experienced a financial loss due to the decline in revenue and profits commensurate with the timing of Needham, Kiger and Eggli's cessation of employment. There is evidence that following Needham's termination, Plaintiff experienced a decline in revenues from Land-O-Lakes, Darling Ingredients, Ardent Mills, Hereford Ingredients and Envirotech.  There is also evidence that Plaintiff experienced a decline in revenue from Advanced Marketing Group, Church & Dwight, Bowman Andros and Sunfair Marketing following Kiger's departure.  The jury could use its common sense to draw a reasonable inference about causation.  There is at least a triable issue of fact as to whether Plaintiff's alleged losses were caused by Defendants' conduct.

The Individual Defendants also argue summary judgment on the breach of contract claims is warranted because Plaintiff has not provided separate computations of damages caused by each alleged wrongdoing. According to the Individual Defendants, because there is no separate computation, there is no number upon which to establish a verdict for each claim.  The general rule is that uncertainty as to the fact of whether damages were sustained at all is fatal to recovery, but uncertainty as to the amount is not if the evidence furnishes a reasonably certain factual basis for computation of the probable loss. *Sack Bros. v. Tri–Valley Co-op., 260 Neb. 312, 616 N.W.2d 786 (2000)*. "A plaintiff's burden of offering evidence sufficient to prove damages cannot be sustained by evidence which is speculative and conjectural, but proof of damages to a mathematical certainty is not required; the proof is sufficient if the evidence is such as to allow the trier of fact to estimate actual damages with a reasonable degree of certainty and exactness." *Pribil v. Koinzan, 266 Neb. 222, 227, 665 N.W.2d 567, 572 (2003)*.

Plaintiff has presented evidence that may furnish a reasonably certain basis for computation of damages. Labenz reviewed documents pertaining to revenue and profit for certain loads and

lanes managed by Needham, Kiger, and Eggli. She then determined the point at which business volume and revenue, and associated profits began to decline for the designated loads and designated lanes, and compared the profit decline date with Needham, Kiger and Eggli's departure dates to arrive at a damage calculation.[8]  Although Labenz did not separate out which lost profits were caused by which alleged wrongdoing, all of Plaintiff's claims asserted in this suit arose from the same set of facts.  A plaintiff may prosecute "consistent remedies, even to final adjudication, so long as the plaintiff receives but one satisfaction."  *Crabar*, 2023 WL 6125519, at * 12 (quoting *Penn. Nat. Mut. Cas. Ins. Co. v. City of Pine Bluff*, 354 F.3d 945, 951 (8th Cir. 2004)).  Labenz's opinion would allow the trier of fact to estimate damages with a reasonable degree of certainty and exactness. It remains up to Plaintiff to show that any proven damages were attributable to some wrongdoing on the part of the Individual Defendants.

### C.    Solicitation of Employees

Needham argues Plaintiff's claim that he breached his Agreement by attempting to solicit or soliciting employees fails because Plaintiff has not put forward evidence demonstrating that he solicited employees and/or that any alleged solicitation or diversion occurred in the twelve-month period following his termination. The Court disagrees.  Needham admitted that he told Burrus he could join NORAG whenever he wanted, and that this conversation happened within the first year of Needham's termination.[9]  Needham also spoke to Kiger in March or April 2019, at which time Kiger mentioned the prospect of coming to work for NORAG.  There is sufficient evidence from which a reasonable jury could conclude that Needham breached the Agreement by soliciting Plaintiff's employees.

Eggli also contends Plaintiff's breach of contract claim based on allegations that he solicited Plaintiff's employees cannot succeed.  Eggli admits he contacted Mai Lee and a couple other employees about employment with NORAG during his first couple months at NORAG.  Eggli argues, however, that Plaintiff cannot show it was damaged by this conduct because the

---

[8] Labenz assumed in performing her calculation that Plaintiff could prove the allegations in its second amended complaint, but doing so was not improper. *See Children's Broad. Corp. v. Walt Disney Co.*, 357 F.3d 860, 864 (8th Cir. 2004) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.").

[9] Burrus did not join NORAG, but Plaintiff gave Burrus a raise to get him to stay with Plaintiff.

employees did not leave Plaintiff to work for NORAG.  As discussed above, there is evidence in the record that Plaintiff sustained financial losses following the departure of Needham, Eggli, and Kiger. The cause of these losses—including any loss attributable to Eggli's alleged solicitation of employees—must be proven by Plaintiff at trial.  Therefore, the Court will not dismiss Plaintiff's claim that Eggli breached his Agreement by attempting to solicit or soliciting employees.

### D.    Confidential Information and Trade Secrets

The Individual Defendants argue Plaintiff cannot prove they breached their Agreements by using and disclosing Plaintiff's confidential information and trade secrets.  Defendants assert Plaintiff cannot demonstrate it was the owner of any "trade secrets," and that Plaintiff has only identified general categories of information that it believes constitutes "confidential information." The Court disagrees.  Plaintiff alleges Defendants misappropriated the following categories of proprietary and trade secret information: truck companies' availability; lane data (including customer rates, rates to the carrier, volumes, and locations); customer payment history evidencing history of expenditures, favorable pricing objectives based on supply and demand; load compilation lists; carrier compilation lists; customer lists; customers' specific patterns of geographical needs, including load and lane history; employee compensation and benefits information; and financial data including gross revenue and margins.  Needham admitted lane data information, which includes customer rates, carrier rates, volumes and locations, is valuable in the freight brokerage business.  Needham stated that NORAG considers lane data information confidential, and that Plaintiff considered lane data to be "no more confidential" than NORAG. Needham also stated that NORAG deems its customer list, customer and carrier contact lists, load lane histories, financial data, and sales revenue information to be confidential.  Whether this information rises to the level of a trade secret or should be considered confidential must be determined by the jury. *See Home Pride Foods, Inc. v. Johnson*, 262 Neb. 701, 708, 634 N.W.2d 774, 781 (2001).

The Individual Defendants also argue Plaintiff's breach of contract claims for alleged violations of the confidentiality provision in the Agreements must be dismissed because Plaintiff has not demonstrated the "useful life" of the alleged confidential information, thereby rendering the Agreements overbroad. If an employee has access to confidential information about an employer's operations sufficient to establish an employer's legitimate protective interest, a

restrictive covenant may be overbroad if the evidence does not show the useful life of the confidential information. *See Kaiser v. Arthur J. Gallagher & Co.*, 8:17CV454, 2018 WL 7958816, at *4 (D. Neb. Mar. 8, 2018) (citing *Brockley v. Lozier Corp.*, 241 Neb. 449, 488 N.W.2d 556, 564 (1992). Here, however, there is evidence that the Individual Defendants immediately began using Plaintiff's alleged confidential information when they left—if not before. Just by way of example, Konecky continued to use the Google Docs after she left Plaintiff's employment and while employed with NORAG. She admittedly granted NORAG access to these documents. Moreover, Eggli testified that he emailed three or four load lists to himself in the last month before he left Plaintiff so he could have them on hand to use when he went to work at NORAG. Eggli stated he probably later uploaded the lists to a NORAG computer. The evidence presently before the Court supports the conclusion that the alleged confidential information was still useful at the time it was misappropriated. It is extremely doubtful that this information lost its usefulness in that short period.

Defendants also contend Plaintiff cannot establish that the Individual Defendants breached their Agreements by using confidential information because they have not demonstrated (1) what information each Individual Defendant used; (2) what information each Individual Defendant disclosed; and (3) how each Individual Defendant used the information and trade secrets. The Court disagrees that the record is so devoid of evidence on these points that summary judgment is warranted. There is evidence that indicates the Individual Defendants used confidential information they obtained through their employment with Plaintiff to obtain business to Plaintiff's detriment. The evidence is sufficient to overcome summary judgment on Plaintiff's claims that they breached the confidentiality provision in their Agreements.

E.    **Breach of Contract Claim Against Konecky**

Konecky argues Plaintiff's breach of contract claim against her fails in its entirety. Plaintiff alleges Konecky breached her Agreement by sharing the Google Drive containing Plaintiff's documents with NORAG. Plaintiff claims the Google Drive contained confidential information and trade secrets. Konecky argues the information on the Google Drive was not confidential because Plaintiff did not make any effort to maintain the secrecy of this information, as employees were able to access the Google Drive via personal gmail addresses. She also claims Plaintiff told her she did not need to delete the Google Drive and could access it when she left. Konecky further

18

argues Plaintiff cannot establish it sustained any damages by her "taking" the Google Drive and the documents contained therein.

The evidence that Konecky continued to use the Google Drive where Plaintiff's documents were stored after she left, and then granted access to the Google Drive to NORAG is sufficient to overcome summary judgment. There is evidence that the Google Docs taken and allegedly shared by Konecky included carrier contacts, carrier lane information, load lists, and information about carrier activity. Needham acknowledged NORAG considers this type of information confidential. The question of whether Konecky was granted permission to use the Google Drive when she left Plaintiff's employment is in dispute. (Filing No. 205.) And as explained above, Plaintiff has submitted sufficient evidence of causation and damages to create a genuine issue of fact as to those issues. Plaintiff has presented evidence of its aggregate loss resulting from the collective efforts of the Individual Defendants as alleged in the second amended complaint. Therefore, Konecky's motion for summary judgment on the breach of contract claim will be denied.

### 2. **Misappropriation of Trade Secrets**

Plaintiff alleges Defendants misappropriated its trade secrets under the Nebraska Trade Secrets Act ("NTSA"), Neb. Rev. Stat. § 87-501 *et seq*., and the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1839. To succeed on a misappropriation of trade secrets claim, the plaintiff must prove: (1) the existence of a trade secret; (2) the value and importance of the trade secret to the employer in the conduct of its business; (3) the employer's right by reason of discovery or ownership to the use and enjoyment of the secret; and (4) the communication of the secret to the defendant while he was employed in a position of trust and confidence and under circumstances making it inequitable and unjust for him to disclose it to others or to use it himself to the employer's prejudice. *Richdale Dev. Co. v. McNeil Co., Inc.*, 244 Neb. 694, 702, 508 N.W.2d 853, 859 (Neb. 1993) (Nebraska Trade Secrets Act); *accord MPAY Inc. v. Erie Custom Computer Applications, Inc.*, 970 F.3d 1010, 1016 (8th Cir. 2020) (federal Defend Trade Secrets Act).

Defendants assert Plaintiff's misappropriation claims under the NTSA and DTSA fail because Plaintiff has not identified with any level of particularly what trade secrets were allegedly misappropriated. The NTSA defines "trade secret" as information that "[d]erives independent economic value, actual or potential, from not being known to, and not being ascertainable by

proper means by, other persons who can obtain economic value from its disclosure or use;" and
"[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy."
Neb. Rev. Stat. § 87-502(4). Something qualifies as a "trade secret" under the DTSA if (1) the
owner of the trade secret has taken reasonable measures to keep such information secret; and (2)
"the information derives independent economic value, actual or potential, from not being generally
known to, and not being readily ascertainable through proper means by, another person who can
obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).
Whether allegedly protected information rises to the level of a trade secret is a question of fact.
*Softchoice Corp. v. MacKenzie*, 636 F. Supp. 2d 927, 937 (D. Neb. 2009) (citing *Home Pride Foods
v. Johnson*, 62 Neb. 701, 708, 634 N.W.2d 774, 781 (2001)).

Plaintiff has raised a question of material fact as to whether it is the owner of protectable
trade secrets.  In its second amended complaint, Plaintiff alleges Defendants misappropriated the
following types of information: truck companies' availability; lane data (including customer rates,
rates to the carrier, volumes, and locations); customer payment history evidencing history of
expenditures, favorable pricing objectives based on supply and demand; load compilation lists;
carrier compilation lists; customer lists; customers' specific patterns of geographical needs,
including load and lane history; employee compensation and benefits information; and financial
data including gross revenue and margins.  Needham admitted that NORAG considers this type of
information valuable and confidential. This listing is sufficiently specific to identify potentially
protectable trade secrets. Whether the information sought to be protected here rises to the level of
a trade secret is a question of fact that must be left to the jury.[10]

Plaintiff has identified security protocols it used to protect the secrecy of this information.
The Individual Defendants were each required to sign employment agreements containing
confidentiality provisions. Further, the Employee Handbook contained a provision prohibiting the
disclosure of Plaintiff's confidential information.  It remains disputed whether Konecky was
granted permission to use the Google Drive when she left Plaintiff's employment. At the very least,
there is a triable issue of fact as to whether Plaintiff adequately safeguarded its information.

---

[10] In a case involving many of the parties involved in this litigation, this Court found there was a dispute of fact as to
whether customer load and pricing data qualified as trade secrets under the NTSA. *See West Plains, LLC v. Retzlaff,*
No. 8:13CV47, 2015 WL 11027252 (D. Neb. Oct. 28, 2015).

Defendants further argue that Plaintiff cannot show that each Defendant misappropriated any trade secrets. "Misappropriation" under the NTSA is defined, in part, as "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," or "[d]isclosure or use of a trade secret of another without express or implied consent by a person who . . . [a]t the time of the disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was . . . [d]erived from or through a person who had utilized improper means to acquire it . . . or [d]erived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use." Neb. Rev. Stat. § 87-502(2). Under the DTSA, "misappropriation" generally consists of (a) acquisition of a trade secret by a person who knows or has reason to know the secret was improperly acquired or (b) disclosure or use of a trade secret of another without express or implied consent. *See* 18 U.S.C. § 1839(5).

As to the Individual Defendants, Defendants argue there is no proof of misappropriation because Plaintiff has not presented evidence of what each Individual Defendant disclosed; that the "trade secret" was disclosed without express or implied consent; and that at the time of disclosure, each Individual Defendant knew or had reason to know that the knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret. As to NORAG, Defendants argue Plaintiff has not demonstrated that NORAG acquired a trade secret and that it knew or had reason to know that the trade secret was acquired by improper means.

The Court finds there is evidence from which a reasonable factfinder could conclude the Individual Defendants misappropriated trade secrets. Upon beginning her employment with NORAG, Konecky used and granted NORAG access to the Google Drive, which may have contained documents with information about Plaintiff's carrier contacts, carrier lanes, load lists, and carrier activity. The day before his termination, Needham emailed himself a copy of a draft agreement between Mars Global and Plaintiff, with attached negotiated terms. When he joined NORAG, he solicited clients identified on his Ten-Client List, and admittedly quoted Plaintiff's historical pricing information to prospective customers when negotiating on behalf of NORAG. Eggli, for his part, emailed load lists to himself in the month before he resigned and, according to his own testimony, may have later uploaded the lists to a NORAG computer. Kiger talked to Needham about coming to work for NORAG in March or April 2019, and then resigned from Plaintiff in August 2019. He then began soliciting customers identified on his Ten-Client List. All

these things happened despite the presence of non-solicitation and confidentiality provisions in employment agreements and a confidentiality provision in Plaintiff's Employee Handbook. A genuine dispute of fact remains as to whether the Individual Defendants misappropriated Plaintiff's trade secrets.

The same is true for NORAG. NORAG representatives met with Needham a week following his termination and offered him a job. A week after that, NORAG acquired M7, despite that M7 had, just prior to Needham's termination, been in merger negotiations with Plaintiff. When Konecky joined NORAG a few months later, she granted NORAG access to the Google Drive containing documents with Plaintiff's allegedly confidential information. Also, there is evidence that NORAG was aware that at least some of the Individual Defendants were subject to non-solicitation and confidentiality provisions, but yet did not take steps to restrict those individuals' contacts with customers. At least some of the Individual Defendants did business with customers identified on their Ten-Client Lists. There is evidence that shows that Plaintiff's revenue decreased around that time-period as to certain customers, while NORAG's revenue from those customers increased. All in all, Plaintiff has submitted sufficient evidence to create a triable issue of fact with respect to its misappropriation claims.[11]

### 3.  **Computer Fraud and Abuse Act**

Plaintiff argues the Individual Defendants violated the Computer Fraud and Abuse Act ("CFAA"), specifically 18 U.S.C. §§ 1030(a)(2)(C) and 1030(a)(4), by accessing the Google Drive and company-owned cell phones to misappropriate confidential information and use it to sell NORAG's services. Plaintiff contends it revoked the Individual Defendants' access to the Google Drive and cell phones when they ceased employment. Plaintiff alleges NORAG's actions constitute violations of 18 U.S.C. § 1030(b), which prohibits attempting or conspiring to violate the CFAA. Plaintiff maintains the Individual Defendants' unauthorized access to Plaintiff's

---

[11] Defendants also argue summary judgment on the misappropriation claims is warranted because Plaintiff cannot show that it suffered an actual loss due to the alleged trade secret misappropriation. However, as set out above, there is a genuine issue of fact as to whether Defendants' conduct resulted in any damage to Plaintiff.

computer systems (and NORAG's conspiracy in this unauthorized access) caused losses exceeding $5,000.

Section 1030(a)(2)(C) of the CFAA generally subjects a person who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer" to civil liability in some circumstances. 18 U.S.C. § 1030(a)(2)(C) and (g). Section 1030(a)(4) of the CFAA prohibits "knowingly and with intent to defraud, access[ing] a protected computer without authorization, or exceed[ing] authorized access, and by means of such conduct further[ing] the intended fraud and obtain[ing] anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period." 18 U.S.C. § 1030(a)(4). A person "'exceeds authorized access' [under the CFAA] when he accesses a computer with authorization but then obtains information located in particular areas of the computer—such as files, folders, or databases—that are off limits to him." *Van Buren v. United States*, 593 U.S. 374, 396 (2021). A person does not exceed authorized access by accessing a database with authorization to retrieve information, even for an improper purpose. *Id*.

Plaintiff maintains the Individual Defendants violated CFAA by accessing the Google Drive, and in Needham and Kiger's case, accessing their company-owned cell phones, after access to these devices was revoked. However, the Google Drive does not meet the CFAA's definition of "computer," which is defined as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device." 18 U.S.C. § 1030(e)(1). The Google Drive is just a computer app that can be accessed through other electronic devices—not just those devices belonging to Plaintiff. In fact, the Google Drive was created and used by Konecky before she was employed by Plaintiff. While the information stored on the Google Drive may have been confidential, the Google Drive itself was not, and Defendants' act of retrieving or viewing documents from the Google Drive does not constitute a violation of the CFAA.

The Eighth Circuit has found, however, that cell phones meet the definition of a "computer." *See United States v. Kramer*, 631 F.3d 900 (8th Cir. 2011). Therefore, Needham and Kiger's act of accessing their company-owned cell phones after their employment ended could

23

potentially qualify as an act of unauthorized access. But the problem with this argument as to Kiger is that he immediately went to Verizon to have his phone cleared out before he returned it. Kiger testified that Waggoner was at Verizon when he did so. There is no evidence that Waggoner attempted to stop him. Plus, Kiger testified that no information could be transferred from his company-owned phone to his new phone, which he got a few days later.

As to Needham, there is no evidence that he had any fraudulent intent at the time he transferred his contacts to his new phone. Plus, the evidence does not support the conclusion that Needham exceeded his authorized access to the phone. Needham thought the phone belonged to him when he left the premises because he brought a personal phone with him when he started working for Plaintiff. Notably, Kiger believed the cell phone he used while working for Plaintiff belonged to him for that exact same reason. After Needham left, Wells had to clarify with Plaintiff's controller that the phone belonged to Plaintiff. After this, Needham was notified that the phone belonged to Plaintiff because it had been upgraded and that he needed to return it. Needham was told to return the phone at 5:15. p.m. that day.

Although Needham had the content of his company phone transferred to his new phone before he returned it, there is no indication he did this for a nefarious or fraudulent reason. The company-owned phone contained Needham's personal information (such as personal numbers, pictures, banking information), as well as business contacts—some of which he had gathered before he began working for Plaintiff. Also, Needham was instructed to return the phone at 5:15 p.m., and Plaintiff has not pointed to any evidence that Needham was instructed not to use or access the phone before he returned it. For these reasons, Plaintiff's CFAA claims fail—including those against NORAG for allegedly conspiring with the Individual Defendants to wrongfully access Plaintiff's computers. Therefore, summary judgment on these claims will be granted.

### 4. **Tortious Interference with Business Relationships**

Defendants argue Plaintiff cannot establish the elements of its tortious interference with business relationship claims. To succeed on a claim for tortious interference with a business relationship or expectancy, a plaintiff must prove "(1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused

the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted." *Summit Restoration, Inc. v. Keller*, 29 Neb. App. 243, 251 953 N.W.2d 816, 823–24 (2020). However, under Nebraska law, a competitor is privileged to interfere with the business expectancy of a rival if "(a) the relation concerns a matter involved in the competition between the actor and the competitor, and (b) the actor does not employ improper means, and (c) the actor does not intend thereby to create or continue an illegal restraint of competition, and (d) the actor's purpose is at least in part to advance his interest in his competition with the other." *The Lamar Co., LLC v. City of Fremont*, 278 Neb. 485, 497-98, 771 N.W.2d 894, 906 (2009) (quotation omitted).

Factors to consider in determining whether interference with a business relationship is improper include: "(1) the nature of the actor's conduct, (2) the actor's motive, (3) the interests of the other with which the actor's conduct interferes, (4) the interests sought to be advanced by the actor, (5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (6) the proximity or remoteness of the actor's conduct to the interference, and (7) the relations between the parties." *Recio v. Evers*, 278 Neb. 405, 418, 771 N.W.2d 121, 131 (2009). This list is not exhaustive, as "[t]he issue in each case is whether or not the interference is improper under the circumstances; whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another." *Id.* at 419, 771 N.W.2d at 132. "The decision depends upon a judgment and choice of values in each situation." *Id.*

Plaintiff has presented sufficient evidence to overcome Defendants' motion for summary judgment on its tortious interference claims. A reasonable jury could conclude that it was improper competition and interference for Defendants to take trade secret or confidential information acquired while employed with Plaintiff and then use it to compete with Plaintiff. *See Crabar/GBF v. Wright*, 8:16-CV-537, 2023 WL 6125519, at *9 (D. Neb. Sept. 19, 2023) ("[The alleged unjustified interference . . . was in using misappropriated confidential information. This is a legally sufficient standard by which to judge a party's interference with a valid business relationship or expectancy"). As set out above, there are material issues of fact remaining as to whether Defendants violated the NTSA and DTSA. If the jury finds that Defendants violated these provisions by misappropriating trade secrets, it could very well also conclude Defendants employed improper means in competing with Plaintiff. *See West Plains*, 2015 WL 11027252, at

*10 ("If the jury determines that the [d]efendants violated the NTSA, this, combined with other facts, could establish that the [d]efendants employed improper means"); Restatement (Second) of Torts § 767 cmt. c. ("Conduct specifically in violation of statutory provisions or contrary to established public policy may for that reason make an interference improper"). Thus, there is a triable issue of fact as to whether Defendants used improper means to compete with Plaintiff.

Likewise, there is a genuine issue of fact as to whether Plaintiff had valid business relationships or expectancies that Defendants interfered with. Plaintiff has presented proof of regular business relationships with certain customers. There is evidence Needham and Kiger solicited Plaintiff's customers identified on their Ten-Client Lists within the first twelve months of their employment with NORAG. There is also evidence Defendants continued to use Plaintiff's confidential business information while employed with NORAG and, at least in Needham's case, used Plaintiff's historical pricing information to negotiate with customers on NORAG's behalf.

Further, there is evidence that Needham used knowledge he acquired while employed with Plaintiff to interfere with Plaintiff's acquisition of M7. Plaintiff had been in discussions with M7 during the spring and summer of 2018 to purchase M7's book of business. Wells met with M7 representatives as late as July 11, 2018 to discuss the potential merger. Within a week of Needham's termination, NORAG had acquired M7. This timing is certainly suspect, and these facts pertaining to M7, combined with others, could support a finding that Defendants acted to interfere with Plaintiff's business relationships. Therefore, Plaintiff's tortious interference claims will not be dismissed.

### 5. **Duty of Loyalty**

Plaintiff claims the Individual Defendants breached their duty of loyalty by misappropriating its confidential information and, in the case Needham, Eggli, and Kiger, by soliciting customers identified on their Ten-Client Lists for NORAG's benefit. "Under Nebraska law, it is a generally recognized principle that an employee owes a duty of loyalty to his employer during the course of his employment . . . irrespective of the existence of a covenant not to compete or nonsolicitation clause." *MeccaTech, Inc. v. Kiser*, No. 8:05CV570, 2008 WL 1820800, at *5 (D. Neb. Apr. 21, 2008) (internal citation omitted). "This means that during the course of their employment, employees must act with fairness and must not do anything harmful to their

employers or their employers' interests." *Id*.  "To give rise to liability, the employee's disloyal conduct must be so harmful as to substantially hinder the employer in the continuation of his business." *West Plains, LLC v. Retzlaff Grain Company Incorporated, 870 F.3d 774, 786 (8th Cir. 2017)* (quotation omitted). "Such conduct might include soliciting customers of the employer or forming one's own competing business while still working for the employer." *Id*.

A jury could reasonably conclude that the Individual Defendants breached their duty of loyalty to Plaintiff.  Konecky left Plaintiff's employment on July 6, 2018.  She testified that one of the reasons she left was because she believed Needham was about to be terminated.  Then, after her resignation, but while still working for Plaintiff, she emailed Needham 25 links to Google Docs.  Needham, who knew he was under investigation and in danger of losing his job, emailed himself a copy of a draft agreement between Mars Global and Plaintiff, with attached negotiated terms.  This email was sent the day before he was fired.  Within four months of Needham's termination on July 12, 2018, Konecky started working for NORAG and continued to use the Google Drive containing Plaintiff's allegedly confidential information.

In March or April 2019, which was approximately four months after Konecky began working for NORAG, Kiger spoke to Needham about coming to work for NORAG.  Needham told him to come back in August 2019.  Kiger followed-up with Needham in August 2019, and then resigned his position on August 29, 2019. Kiger began soliciting customers on his Ten-Client List within the first year of his employment with NORAG. Then, just a couple months later, in October 2019, Eggli contacted Kiger about working at NORAG.  However, Eggli did not resign his position with Plaintiff until February 21, 2020. On the morning he resigned, Eggli emailed himself 29 pages of contact information for Plaintiff's customers and carriers.  Eggli also emailed several load lists to himself in the last month before he left Plaintiff to use when he went to work at NORAG. In short, the series of events that occurred between Konecky's and Eggli's resignations could paint the story of a breach of loyalty for a reasonable jury.  The events that occurred during this timeframe present at the very least a triable issue of fact as to whether the Individual Defendants breached their duty of loyalty.  Therefore, summary judgment on this claim will be denied.

6. **Unjust Enrichment**

Plaintiff has presented sufficient evidence on unjust enrichment to overcome summary judgment. To recover on a claim for unjust enrichment, "the plaintiff must show that (1) the defendant received money, (2) the defendant retained possession of the money, and (3) the defendant in justice and fairness ought to pay the money to the plaintiff." *Kanne v. Visa U.S.A. Inc.,* 272 Neb. 489, 723 N.W.2d 293, 302 (2006). Here, there is evidence Plaintiff sustained lost revenue from certain customers contained in the Ten-Client Lists, whereas NORAG had an increase in business from those customers. There is also evidence the Individual Defendants used Plaintiff's confidential business information to obtain business benefiting NORAG. There is a triable issue of fact as to unjust enrichment.

7. **Civil Conspiracy**

Plaintiff alleges Defendants engaged in a civil conspiracy by acting in concert with one another to commit the alleged wrongful acts. "A civil conspiracy is a combination of two or more persons to accomplish by concerted action an unlawful or oppressive object, or a lawful object by unlawful or oppressive means." *deNourie & Yost Homes, LLC v. Frost*, 289 Neb. 136, 156, 854 N.W.2d 298, 316 (2014). "By establishing a civil conspiracy, a plaintiff extends liability for the wrongful acts underlying the conspiracy to those actors who did not actively engage in the acts, but conspired in their commission." *Summit Restoration, Inc. v. Keller*, 29 Neb. App. 243, 257 953 N.W.2d 816, 827 (2020). "In proving conspiracy to tortiously interfere with a business relationship, a claim of civil conspiracy is not actionable in itself, but serves to impose vicarious liability for the underlying tort of those who are a party to the conspiracy." *Id*. In the absence of an underlying tort, there can be no cause of action for conspiracy to commit the tort. *deNourie*, 289 Neb. at 157, 854 N.W.2d at 316.

"A party does not have to prove a civil conspiracy by direct evidence of the acts charged. It may be proved by a number of indefinite acts, conditions, and circumstances which vary according to the purpose to be accomplished." *Id*. at 156, 854 N.W.2d at 316. However, the existence of at least an implied agreement must be proven to establish conspiracy. *Id*.

A genuine issue of fact precludes summary judgment on Plaintiff's conspiracy claims. There is evidence that NORAG may have been aware of the non-solicitation and confidentiality

28

provisions in the Individual Defendants' Agreements. There is testimony that NORAG did not place any restrictions on Needham, Eggli, and Kiger's contact with customers. Also, the timing of NORAG's merger with M7 is curious. Needham received a job offer from NORAG on the day that NORAG was finishing negotiations with M7 for the merger. M7's merger with NORAG was finalized within a week of Needham's hire. Konecky also shared access to the Google Drive with NORAG.

Needham was aware he was in danger of being fired. The day before his termination, he emailed a draft agreement between Plaintiff and Mars Global to himself. Very shortly after his termination, he received a job offer from NORAG. Eggli also emailed documents to himself in the months (and even morning of) his resignation. Further, there is evidence Kiger was planning to leave Plaintiff for NORAG several months before he did so. He had a conversation with Needham about the prospect of employment with NORAG in March or April 2019, but did not resign until August 2019. Given the evidence before the Court, the question of whether a civil conspiracy existed must be left to the finder of fact.

### 8. **Aiding and Abetting**

Plaintiff alleges Needham and NORAG aided and abetted the other Individual Defendants' tortious conduct. "[P]rovided there is an underlying actionable tort, . . . civil abetting liability arises for one who counsels, commands, directs, advises, assists, or aids and abets another individual in commission of a wrongful act or tort." *KD Douglas Cnty. Sch. Dist. No. 001*, 1 F.4th 591, 601 (8th Cir. 2021) (internal citation and quotation omitted). "The Nebraska Supreme Court employs the same lenient aiding and abetting standard in civil tort claims as it does in criminal actions: mere encouragement or assistance is sufficient to impose liability." *Id.*

For many of the reasons mentioned previously (that will not be repeated here), there is sufficient evidence that Needham and NORAG may have advised, assisted, and directed Konecky, Kiger, and Eggli's alleged wrongful acts. For instance, Konecky emailed Needham multiple documents shortly before she left Plaintiff's employment, while knowing that Needham was in danger of being terminated. Konecky also shared the Google Drive with NORAG. Needham also communicated with Kiger about a position with NORAG several months before Kiger left Plaintiff. There is also evidence NORAG did not take any steps to limit the Individual Defendants'

29

access to certain customers. Therefore, summary judgment will not be granted on Plaintiff's aiding and abetting claims.

Accordingly,

**IT IS ORDERED:**

1. Defendants' Motion for Summary Judgment (Filing No. 181) is granted, in part.

2. Plaintiff's breach of contract claim against Jordan Eggli is dismissed, but only insofar as it is based on allegations that Eggli committed breach of contract by soliciting customers identified on his Ten-Client List.

3. Plaintiff's claims under the Computer Fraud and Abuse Act are dismissed.

4. Defendants' Motion for Summary Judgment is otherwise denied.

Dated this 4th day of October, 2024.

BY THE COURT:

Susan M. Bazis
United States District Judge